**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| PATRICIA WILSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 4:08CV1800-DJS |
| | ) |
| ERIK K. SHINSEKI, | ) |
| Department of Veterans Affairs, | ) |
| | ) |
| Defendant. | ) |

**ORDER**

Plaintiff Patricia Wilson, an African-American woman born
in 1963, alleges that defendant Erik K. Shinseki, Secretary for the
Department of Veterans Affairs ("VA"), discriminated against her
because of her race and sex, and retaliated against her because of
prior Equal Employment Opportunity activity. She seeks relief
pursuant to Title VII of the Civil Rights Act of 1964 ("Title
VII"), 42 U.S.C. § 2000e et seq. Doc. #31, p. 1.[1] Now before the

---

[1] Plaintiff's amended complaint, brought pursuant to Title VII,
contains three counts, Count I entitled "Race and/or Sex
Discrimination," Count II entitled "Retaliation," and Count III entitled
"Retaliation." See Doc. #31. The Court notes that although plaintiff's
memorandum in opposition to the instant motion for summary judgment
refers to Count "IV," Doc. #53, p. 1, no such count exists. Further,
the Court notes that, although defendant treats Count III as one
including an age discrimination claim, plaintiff does not specifically
assert a claim pursuant to the Age Discrimination in Employment Act
("ADEA"), 29 U.S.C. § 621 et seq., in her amended complaint, nor does
she attempt to argue that she should be allowed to proceed to trial on
an age discrimination claim in her memorandum in opposition to
defendant's motion for summary judgment. See Docs. #31, 53. Indeed,
the word "age" appears in her opposition brief only once, when she
generally defines "discrimination," Doc. #53, p. 9, and does not appear
at all in her statement of additional facts, Doc. #52. To the extent
plaintiff's retaliation claims contained in her amended complaint
mention her EEO charge, which included a complaint of age
discrimination, such claims do not support a separate claim for age
discrimination under the ADEA in this action. See, e.g., Duncan v.

Court is defendant's motion for summary judgment [Doc. #39], and plaintiff's opposition thereto. The matter has been fully briefed and is ready for disposition.

## Standard of Review

In considering a motion for summary judgment, the Court must "view all of the evidence in the light most favorable to the nonmoving party and [will] give that party the benefit of all reasonable inferences to be drawn from the facts disclosed in the pleadings." Reich v. ConAgra, Inc., 987 F.2d 1357, 1359 (8th Cir. 1993). "Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Id. "Although the moving party has the burden of demonstrating the absence of genuine issues of material fact, the 'nonmoving party may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial.'" Burchett v. Target Corp., 340 F.3d 510, 516 (8th Cir. 2003) (quoting Rose-Maston v. NME Hosps., Inc., 133 F.3d 1104, 1107 (8th Cir. 1998)). "To overcome a motion for summary judgment, '[a] plaintiff may not merely point

---

Delta Consol. Indus., Inc., 371 F.3d 1020, 1025 (8th Cir. 2004) (noting that, in the context of sexual harassment, charges of sexual harassment generally "are not like or reasonably related to retaliation charges for complaining about antecedent harassment").

The Court finds that no ADEA age discrimination claim is asserted by plaintiff in her amended complaint. Alternatively, it appears that any inferred claim of age discrimination has been abandoned by plaintiff. Finally, the Court notes that, because plaintiff agrees that her age claim is that she is being treated differently than someone who is a seasoned employee, individuals who are generally older than plaintiff, see Doc. #51, p. 11, a prima facie case of age discrimination is not supported by the evidence in the record.

to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor.'" <u>Reed v. Lear Corp.</u>, 556 F.3d 674, 678 (8th Cir. 2009) (quoting <u>Davidson & Assocs. v. Jung</u>, 422 F.3d 630, 638 (8th Cir. 2005)). In ruling on a motion for summary judgment, "a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from 'assuming' that general averments embrace the 'specific facts' needed to sustain the complaint." <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888 (1990). Consequently, in order to withstand a motion for summary judgment, evidence submitted by a non-movant must contain specific facts, and general statements will not be supplemented by a court's assumptions.

> It will not do to "presume" the missing facts because without them the affidavits would not establish the injury that they generally allege. That converts the operation of Rule 56 to a circular promenade: plaintiff's complaint makes general allegation of injury; defendant contests through Rule 56 existence of specific facts to support injury; plaintiff responds with affidavit containing general allegation of injury, which must be deemed to constitute averment of requisite specific facts since otherwise allegation of injury would be unsupported (which is precisely what defendant claims it is).

<u>Id.</u> at 889. Further, the Court is "'not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some

specific facts that might support the nonmoving party's claim.'" White v. McDonnell Douglas Corp., 904 F.2d 456, 458 (8th Cir. 1990) (quoting InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989)).

## Facts

For purposes of this motion, the Court finds that the following facts are not in dispute, or have not been properly controverted pursuant to E.D.Mo. L.R. 7-4.01(E).[2] Plaintiff is an African-American woman who was born in 1963. She is currently employed with the VA as an Education Liaison Representative and Compliance Survey Specialist. This is a "combo" position, for which no description exists. She has held this position for approximately six years. She is currently paid as a GS-11.

### Initial Administrative Complaints

Plaintiff filed two separate formal complaints with the VA, Office of Employment Discrimination Complaint Adjudication ("EEO"), the first on December 21, 2006 (Complaint No. 2003-0331-2007100470), and the second on April 2, 2007 (Complaint No. 2003-0331-2007101595). She alleged that officials at the VA Regional Office in St. Louis, Missouri discriminated against her. With respect to Complaint No. 2003-0331-2007100470, plaintiff made two claims. The first claim brought by plaintiff was whether on the bases of race, age, sex, and reprisal she was discriminated

---

[2]"All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party." E.D.Mo. L.R. 7-4.01(E).

against by not being paid at the appropriate rate for serving in a combo position. The second claim brought by plaintiff was whether on the bases of race, age, sex, and reprisal she was discriminated against by having been placed in a harassing and hostile work environment when (1) she was asked if she needed any additional training, and (2) a coworker was told not to help her. With respect to Complaint No. 2003-0331-2007101595, the issue raised by plaintiff was whether on the bases of race, age, and reprisal she was discriminated against with respect to her non-selection for the position of Human Resource Specialist, GS-11/12, under vacancy announcement number MPA 07-331-04-52. Plaintiff felt that her non-selection was the result of an email sent to the entire Education division alluding to an affair with the Division Chief and one of the Education division employees.

On December 10, 2007, the EEO issued a Final Agency Decision finding that plaintiff failed to establish evidence that she was discriminated against based on race, sex, age, and reprisal with regard to the claims she raised. There is no reference in the Investigation Report or the Final Agency Decision to any alleged claim about plaintiff being wrongfully written up, the VA's placement of plaintiff on a performance improvement plan ("PIP"), plaintiff being held to higher standards than other employees (other than that referenced in her claim about her combo position), not being promoted (other than the Human Resources Specialist

position), and being subject to unfair labor practices.[3] The first time plaintiff contacted an EEO counselor regarding her allegation that she was performing duties outside her job description was on November 3, 2006.

**Duties Outside Job Description**

When plaintiff was hired to her current position approximately six years ago, she was told that she was going to be the Education Liaison Representative and would perform duties as a Compliance Specialist. Plaintiff agrees that she has been receiving performance evaluations based on this combo position since she was hired in 2003. Plaintiff claims that she is not being compensated for the tasks relating to her duties as a Compliance Specialist.[4] She states that she has been discriminated against with respect to her duties as a Compliance Specialist "because there is no established [position description] which denotes the responsibilities of a dual assignment or a combo...[and] although there is no established [position description]...management has a performance evaluation which I'm held accountable to." Doc. #41-1, pp. 7-8. Because there is no

---

[3]Plaintiff disputes this fact, stating that she tried to contact management because she believed she was being subjected to a hostile work environment and abusive, condescending and disrespectful behavior by her supervisor, and further, that she took issue with the criteria used to determine her bad performance which caused her to be placed on the PIP. Doc. #51, p. 3. The Court fails to see how plaintiff's statement controverts the fact of what is and what is not referenced in the Investigation Report and the Final Agency Decision, and will accordingly deem this fact admitted pursuant to this Court's local rules.

[4]Plaintiff states that she is performing the duties of a GS-1808, but not being paid a salary commensurate to a GS-1808 position.

position description, plaintiff states that she is "not totally
privy of what I'm required to do as an ELR/Compliance." Id. at 8.
Plaintiff states that she is judged in her performance evaluations
as both an Education Liaison Representative and a Compliance
Specialist. Plaintiff states that it is difficult to meet the
requirements of both positions, and that the manner in which she is
evaluated increases her chances of being assessed a lower mark.

**Assistance From Other Employees**

Plaintiff also claims that she was denied assistance from
other employees. At or around November 6, 2006, plaintiff
contacted one of her coworkers regarding the generation of a
certain report. Plaintiff states that after she informed her
supervisor, Stanton Nickens, a Caucasian male, that she had asked
a coworker about this report, he became offended. Plaintiff
further states that Nickens told her that she should not be
contacting other employees regarding questions, but rather should
address her questions directly to him, her supervisor. As her
basis for claiming that Nickens' alleged denial of assistance from
other employees was racially motivated, plaintiff states that "I
felt it was racially inclined because of his background as a
retired military person, and his tactics and communication was
harsh and stern." Doc. #41-2, p. 10. She also asserts that, "[i]n
my opinion I felt that he gave more support to Caucasians," and
that

> I feel that based on my race...I was treated
> differently, whereas when white employees have
> ideas on conference calls, they give ideas, they

are always told it's a great idea.  I'm glad you
mentioned that.  But when I say it, it's never
recognized.  It's brushed off.  It's a moot
point, until I got to a point, even on the
conference calls, I quit making comments.

Id.  Regarding gender, plaintiff alleges that "I felt that
[Nickens] was personally attacking me because I was of the female
gender."  Id.

Nickens stated that he received some compliance survey
schedules that had been submitted incorrectly by plaintiff.  He
states he contacted plaintiff and gave her instructions in order to
get the schedules done correctly.  According to Nickens, plaintiff
contacted Eva Millhouse and came back to Nickens stating that
Millhouse had provided different instructions than Nickens had.
According to Nickens, he instructed Millhouse to refer plaintiff's
calls to him in order to get the problem with the compliance survey
schedules resolved as he had done with other employees.

Plaintiff states that Nickens felt that plaintiff's
seeking help from her peer group circumvented his authority.
Plaintiff states that Nickens called Millhouse and told her not to
answer plaintiff's questions ever again but to refer plaintiff to
Nickens, and then told plaintiff not to contact any other employees
to ask questions.

**PIP**

In April of 2007, plaintiff was verbally placed on a PIP
and was provided with a formal notification of this PIP on November
14, 2007.  Michelle Lacy-Rush, an African-American female, was
plaintiff's immediate supervisor at the time the PIP was issued.

According to the PIP, plaintiff's performance was unacceptable regarding two performance elements -- timeliness and quality. With respect to timeliness, plaintiff was required to review and complete approvals within 30 days of receipt at least 91 percent of the time. According to the letter from Lacy-Rush, for the third and fourth quarters of fiscal year 2007, plaintiff's rate of timely completion was only 67%. Plaintiff, however, challenges the criteria used in her evaluation. That is, plaintiff disputes the rationale that determines percentages and that she was rated on elements not in the VA manual. Plaintiff states that the VA does not have a policy that allows an employee to calculate and determine if the statistical format is reasonable and accurate. Plaintiff does not agree to the percentages on what she was accountable for and appealed those ratings to management.[5] However, nothing was changed.

With respect to quality, plaintiff was required to review and complete compliance surveys with an accuracy rate greater than 90% during the rating period. Plaintiff's rates were deficient for three of the quarters for fiscal year 2007, including the first (83%), second (79%), and fourth (79%). Plaintiff, however, again

[5]In her deposition, plaintiff stated,

> I'm not saying it's not 67. I was never provided any statistical formats where I could intelligently, you know, figure it up myself to determine if it's accurate. So I'm not saying it's right or wrong. My thing is we don't have a standard policy that gives the employees an opportunity to calculate these things and determine if it's accurate.

Doc. #41-2, p. 17.

challenges the criteria used in her evaluation because the VA does not have a policy that allows employees to determine if the percentages have some mathematical and statistical format. Plaintiff also disputes these percentages because she disagrees with the way the quality reviewer marked her surveys and states that she does not agree to that which she is being held accountable. Further, plaintiff states that she was held to a higher standard in that she was held to being a GS series 1801 <u>and</u> 1808.

Plaintiff believes her PIP limited her ability to get promoted. Further, although plaintiff's base salary was the same amount while on the PIP, she claims that she went through much stress and had to use annual and sick leave. Plaintiff was taken off the PIP in 2008.

Plaintiff states that her PIP subjected her to different treatment than a Caucasian male who was placed on a PIP, because he received help to correct his problems. Plaintiff asserts that John Johnson was assigned to assist her, but that he provided no guidance, no schedule, and no help on any issues on plaintiff's PIP. Further, plaintiff claims that a Caucasian male was allegedly found using a government car for his own personal benefit, failing to complete work on time, and taking credit for work not complete and was not placed on a PIP, but was given the option of being fired or taking a demotion. Plaintiff did not provide the name of this employee, and there is no evidence regarding this employee's supervisor or performance otherwise.

With regard to the PIP, plaintiff initiated contact with an EEO counselor on January 4, 2008, and filed a formal complaint of discrimination on April 4, 2008. Doc. #44-1, p. 1. This contact with an EEO counselor occurred almost eight months after being verbally placed on the PIP, and 50 days after formal notification.

**Hostile Environment**

Plaintiff states that when she was praised by a school for her performance, Nickens never acknowledged or recognized that accolade. Plaintiff further states that Nickens was verbally abusive, condescending, and disrespectful to plaintiff, and always treated her like she was incompetent. Plaintiff contacted the Undersecretary of Benefits to change the way in which she was treated. However, plaintiff states that although she complained to management, no one tried to resolve the problem. Plaintiff states that this created a hostile work environment, which caused her stress and required her to take sick time off to maintain her sanity.

Plaintiff states that, after serving in his position for three months, Nickens, who was aware of her EEO activity, gave plaintiff a poor performance evaluation. Plaintiff states that this was the first poor evaluation she received. Plaintiff further states that Nickens contacted Millhouse and asked her whether plaintiff needed additional training, even though Millhouse had not reviewed plaintiff's work. Based on Millhouse's response, plaintiff was required to take additional training. She was the

only Education Liaison Representative required to take additional training.

Plaintiff recounts an instance when she needed to update her computer system so as to have the proper encryptions. Plaintiff was unable to reestablish her password so as to have the proper security for emails, so she notified Nickens of the problem. Plaintiff wanted to contact the Hines, Illinois, office, but Nickens told her no. A chief of IM then used plaintiff's computer to send an email to Nickens on having plaintiff work with the Hines expert. Nickens thought that plaintiff sent it to him, and called plaintiff and began shouting at her for the email. When plaintiff informed Nickens that Mitch Wilson from IM sent the email, he accused plaintiff of lying to him.

When asked if she was aware if any management official made any racial slurs or advanced stereotypes about a person's race, plaintiff said, "No." Doc. #41-2, p. 40. Plaintiff also stated that she had not heard any management official make any negative or adverse comments about a person's race or gender. With respect to an employee's EEO activity, plaintiff states that Nickens felt it "was a joke." Id. Plaintiff further states that he did not really say that it was a joke "because he said he heard it through the grapevine, and some other comments that he made just made me feel that the importance or the, you know, the level of professionalism associated with anyone filing a complaint with the VA is not held in high regard with management." Id. Plaintiff further states that "I've even been told that when employees go to

HR now, they are telling them to go file an EEO complaint.  And in my opinion I think they are telling them that because they know the system is broke.  They know that the administrative law judge is going to concur with anything that the VA does because that's what they've done.  And so they are referring people, they are telling me, file an EEO."  Id.

**Failure to Promote**

On December 4, 2006, plaintiff applied for a Human Resources Specialist position with the VA, Position Announcement Number MPA 394-07-331-04-52.  James David Unterwagner, Acting Director of the St. Louis VA regional office, was the selecting official for the Human Resources Specialist Position.  Unterwagner is a Caucasian male, over 40 years old.  Prior to the selection of this position, Unterwagner was aware of plaintiff's race and her prior EEO activity, but he did not know her age.

There was a panel of three individuals who conducted the interviews for the Human Resources Specialist position including Unterwagner, Charlene Romans, and Yvonne Hamilton.  Romans is a Caucasian female, age 61, who works as a Human Resources Specialist at the VA Human Resources center in Detroit, Michigan.  She served on the panel as a human resource expert in the selection process for the Human Resources Specialist position.  Prior to the selection process, Romans was not aware of plaintiff's race, age, or prior EEO activity.  Romans attended all of the applicant interviews via conference call.  Hamilton is an African-American female, age 56, and works as Chief of the VA Liaison Office at the

VA Records Management Center.  Prior to being selected for the Chief of Customer Service, Hamilton worked in Human Resources for 10 years.  Prior to the selection process, Hamilton was not aware of plaintiff's race, age, or prior EEO activity.  Hamilton attended the interview with plaintiff via conference call.  Plaintiff agrees that Romans and Hamilton were not aware of plaintiff's prior EEO activity at the time of the selection.

There were three applicants for the position: plaintiff, James Thomas, an African-American male over 40 years of age who at the time of the interview did not work at the VA, and a third candidate, an African-American female.  Thomas was selected for the Human Resources Specialist position.  The panel selecting this position looked at the following criteria in deciding the person who was most qualified for the position: (1) applicant's self-assessment of their possession of the knowledge, skills, and abilities associated with this position; (2) applicant's education with an emphasis on human resources; (3) applicant's human resource experience; (4) results of the performance-based interviews of each applicant; (5) feedback from supervisors regarding the applicants; and (6) results from the written exercise developed to test program awareness and writing skills.[6]  Each criterion was worth 20% of the

---

[6]Plaintiff disputes this fact, and states as follows to support her contention:

> Wilson noted one particular interview for MPA7, where Mr. Douglas Bragg and Unterwagner interviewed her.  The interview was about the time that Wilson applied for the open vacancy.  In the interview for the position Wilson felt that her responses to questions were falling on deaf ears and that

candidate's total score except education and the written exercise;
those two criteria were only worth ten percent each.  The panel
used an objective scoring system to evaluate each of these six
criteria for each of the applicants and Thomas received a score of
24.1 (with a weighted score of four), the highest score of the
three applicants.  Plaintiff received a score of 13.4 (with a
weighted score of 2.1), the lowest score of the three applicants.[7]
According to all three panel members, race, age, or prior EEO

---

> Unterwagner was rushing Wilson through her
> responses.  Unterwagner even made a comment "I don't
> want to, I don't want to appear that I'm rushing
> you."  The person hired was not an employee at the
> time with the VA.  Wilson found that by James Thomas
> receiving the position it was reprisal for filing
> her prior EEO. Further, James Thomas was a male from
> the outside.

Doc. #51, p. 16 (cross-referencing Doc. #52, p. 4).  The Court fails to
see how the above cited material controverts the selection criteria used
to evaluate the candidates.  To the extent plaintiff states that hiring
Thomas was reprisal for filing her prior EEO, such a general self-
serving allegation provides nothing more than plaintiff's
unsubstantiated belief and is not sufficient to controvert the properly
supported facts set forth by defendant.

[7]Plaintiff disputes this fact, stating that she

> believes that the St. Louis Management is a 'good-
> old-boy system' that people that are liked and fit
> in with them regardless of their work experience.
> [Plaintiff] further [feels] that James Thomas was
> brought in as a strategy to avoid [plaintiff]
> claiming race discrimination because James Thomas
> was a black person.

Doc. #51, pp. 16-17 (cross-referencing Doc. #52, p. 4).  Again,
plaintiff's "belief" concerning the St. Louis management is nothing more
than a general self-serving allegation and is not sufficient to
controvert the properly supported facts set forth by defendant.
Further, to the extent plaintiff argues defendant's hiring of a black
person demonstrates its strategy to stymie a failure-to-promote
discrimination claim based on race and is therefore evidence of racial
discrimination, such an argument is altogether absurd and will not be
considered.

activity were not factors in the selection of this position. Unterwagner stated that plaintiff was not a poor candidate, but rather that Thomas had more experience, knowledge, skills, and ability.[8]

Plaintiff alleges that "there was an email sent to various employees by another employee that plaintiff had a romantic relationship with another employee" and that this email was sent out to affect negatively plaintiff's chance of this promotion. Doc. #31, p. 4. The email referred to by plaintiff is an email dated August 17, 2006, by Douglas Bragg to over 160 employees regarding a rumor about Bragg allegedly having an affair. Nowhere in the email does Bragg refer to plaintiff; however, plaintiff states that her name was attached to the rumor, and told Bragg she felt he did not protect her as an employee. Bragg never had a conversation with the selecting official regarding plaintiff and the Human Resource Specialist position. Unterwagner was aware of the email; however, all three of the panel members state that the

_____

[8]Regarding education, plaintiff tied Thomas as they both obtained a master's degree, and therefore, both received the same score for education. Regarding experience, plaintiff lacked experience compared to Thomas' 21 years and six months in both military and civilian service in the field of human resources. While plaintiff served as a union representative, she did not have any direct human resources experience. Regarding the performance based interview conducted by the panel of three individuals, plaintiff scored the lowest of all three. Plaintiff received a score of 1.86 compared to Thomas' score of 4.0 for the performance based interview. With respect to supervisory feedback, plaintiff again scored the lowest. Plaintiff received a score of 2.2 compared to Thomas' score of 3.71 regarding supervisory feedback. Similarly, plaintiff scored the lowest on the objective written exercise where the panel looked at things like grammar and misspelled words, as well as the applicant's program awareness, meaning what did the applicant understand to be the role of the Human Resources specialist. Plaintiff received a score of 1 compared to Thomas' score of 3 with respect to the objective written exercise.

email from Bragg was not a factor in the selection of the Human Resources Specialist position.

## Amended Complaint

In Count I of her amended complaint, plaintiff specifically alleges gender and race discrimination because: (1) she was performing duties outside her job description for which she was not compensated; (2) she was informed that she needed additional training; (3) she was told by her superior to direct her questions to him, not other employees; and (4) her supervisor told other employees not to assist her but rather to refer her to her supervisor. Further, she alleges in Counts II and III gender and race discrimination, and retaliation for: (1) being placed on a PIP; (2) being held to higher standards than other employees; and (3) not being promoted to the Human Resources Specialist position. The Court also finds that plaintiff alleges gender and race discrimination, and retaliation for the generally alleged hostile manner in which she was treated by her supervisor.

## Discussion

Plaintiff asserts claims of gender discrimination, race discrimination, and retaliation for prior protected EEO activity pursuant to Title VII. Before a district court may hear a discrimination claim, the employee must fully exhaust her administrative remedies. "For a federal employee, this requires...that she 'initiate contact' with an [EEO] counselor 'within 45 days of the date of the matter alleged to be discriminatory' or of the effective date of the alleged

discriminatory personnel action." <u>Burkett v. Glickman</u>, 327 F.3d 658, 660 (8th Cir. 2003) (quoting 29 C.F.R. § 1614.105(a)(1)). "If the matter cannot be resolved informally with the help of the counselor, the employee may file a formal EEO complaint with the agency." <u>Id.</u> (citing 29 C.F.R. § 1614.106). An employee's employment-discrimination claim is barred if the record reveals that the alleged discriminatory event did not occur within 45 days preceding consultation with an EEO counselor. <u>Lingo v. Potter</u>, 198 Fed. Appx. 566, 566 (8th Cir. 2006) (citing <u>Burkett</u>, 327 F.3d at 660).

Claims of discrimination that satisfy the timing and exhaustion requirements of Title VII are analyzed under the familiar burden-shifting scheme developed in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Under the <u>McDonnell Douglas</u> framework, the initial burden rests with a plaintiff, who must establish a prima facie case of discrimination or retaliation by a preponderance of the evidence. <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 (1993); <u>see also Carpenter v. Con-Way Cent. Express, Inc.</u>, 481 F.3d 611, 616 (8th Cir. 2007). To do so, a plaintiff must show that "(1) [s]he is a member of a protected class, (2) [s]he was meeting [her] employer's legitimate job expectations, (3) [s]he suffered an adverse employment action, and (4) 'similarly situated employees outside the protected class were treated differently.'" <u>Carpenter</u>, 481 F.3d at 616 (quoting <u>Shanklin v. Fitzgerald</u>, 397 F.3d 596, 602 (8th Cir. 2005), <u>cert. denied</u>, 546

U.S. 1066 (2005)).[9]  After a plaintiff has made a sufficient
showing of a prima facie case, the burden shifts to the defendant
to articulate a legitimate, nondiscriminatory reason for the
adverse action.  Gordon v. Shafer Contracting Co., 469 F.3d 1191,
1196 (8th Cir. 2006).  Once such a reason is articulated, the
burden of production shifts back to the plaintiff to demonstrate
that the proffered nondiscriminatory reason is a pretext for
intentional discrimination or retaliation.  Id.  At this third
step, a plaintiff is obligated to present evidence that (1) creates
a question of material fact as to whether a defendant's proffered
reasons are pretextual and (2) creates a reasonable inference that
gender, race, or prior EEO activity was a determinative factor in
the adverse employment decision.  See Stewart v. Indep. Sch. Dist.
No. 196, 481 F.3d 1034, 1043 (8th Cir. 2007); Logan v. Liberty
Healthcare Corp., 416 F.3d 877, 880 (8th Cir. 2005); Keathley v.
Ameritech Corp., 187 F.3d 915, 922 (8th Cir. 1999).

     With regard to the third element of a prima facie case,
isolated incidents, unless extremely serious, will not support a
finding of discrimination.  Ross v. Kansas City Power & Light Co.,
293 F.3d 1041, 1051 (8th Cir. 2002).  Courts are to determine
"whether an environment is sufficiently hostile or abusive by

---

[9]Establishing a prima facie case of hostile work environment based
on discrimination requires plaintiff to demonstrate the following:(1)
she is a member of a protected group; (2) unwelcome harassment occurred;
(3) a causal nexus existed between the harassment and her
protected-group status; (4) the harassment affected a term, condition,
or privilege of employment; and (5) her employer knew or should have
known of the harassment and failed to take prompt and effective remedial
action.  Austin v. Minn. Min. & Mfg. Co., 193 F.3d 992, 994 (8th Cir.
1999).

looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (quotations omitted). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Id. (quotation omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (quotation omitted); see also Higgins v. Gonzales, 481 F.3d 578, 584 (8th Cir. 2007) ("Termination, cuts in pay or benefits, and changes that affect an employee's future career prospects are significant enough to meet the standard, as would circumstances amounting to a constructive discharge. Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage do not satisfy the [third] prong." (quotation omitted)); Recio v. Creighton Univ., 521 F.3d 934, 940 (8th Cir. 2008) (stating that most of plaintiff's allegations "are akin to the sort of trivial harms that do not rise to the level of retaliation" (quotation omitted)). "Title VII...does not set forth 'a general civility code for the American workplace.'" Higgins, 481 F.3d at 589 (quoting Burlington N. &

<u>Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006)).  As such, certain behavior continues to be "non-actionable under the retaliation provision such as petty slights or minor annoyances that often take place at work and that all employees experience, personality conflicts at work that generate antipathy, and snubbing by supervisors and co-workers."  <u>Id.</u> at 589-90 (quoting <u>Burlington N.</u>, 548 U.S. at 68).

Quarreling with the soundness of a business' judgment in selecting one employee over another employee for promotion, without more, is not evidence of discrimination.  <u>Davenport v. Riverview Gardens Sch. Dist.</u>, 30 F.3d 940, 945 (8th Cir. 1994) (discussing business judgment in the context of a dismissal).  A plaintiff's personal belief that she was the best person for a certain position is not particularly relevant.  Rather, "it is the employer's role to identify those strengths that constitute the best qualified applicant."  <u>Kincaid v. City of Omaha</u>, 378 F.3d 799, 805 (8th Cir. 2004) (quotation omitted).  An employer is free to select its own criteria for evaluating and selecting candidates for employment.  The Court cannot second guess an employer's chosen selection criteria, and a plaintiff cannot suggest what qualifications should be given the most weight.  "[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination."  <u>Hutson v. McDonnell Douglas Corp.</u>, 63 F.3d 771, 781 (8th Cir. 1995).

Similarly, disputes concerning the seriousness of various incidents "merely question[] the soundness of [a] defendant's judgment." Davenport, 30 F.3d at 945. An employer may develop arbitrary, ridiculous, and even irrational policies so long as they are applied in a nondiscriminatory manner, and discrimination claims do not require or authorize a court to engage in examination of the wisdom of an employer's judgment in personnel matters. See, e.g., McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507, 512 (8th Cir. 1995); Smith v. Monsanto Chem. Co., 770 F.2d 719, 723 n.3 (8th Cir. 1985). Employment discrimination laws prohibit "intentional discrimination based on certain, discrete classifications; [they] do[] not prohibit employment decisions based on other factors, such as job performance, erroneous evaluations, personality conflicts, or even unsound business practices." Rose-Maston, 133 F.3d at 1109.

Evidence that similarly-situated employees were treated differently can be evidence of unlawful discrimination. To show that other employees are similarly situated, a plaintiff is "required to point to individuals who 'have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.'" Marquez v. Bridgestone/Firestone, Inc., 353 F.3d 1037, 1038 (8th Cir. 2004) (per curiam) (quoting Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000)). "Employees are similarly situated when they are involved in or accused of the same offense and are disciplined in different ways," and the test is a rigorous

one.  <u>Harvey v. Anheuser-Busch, Inc.</u>, 38 F.3d 968, 972 (8th Cir. 1994) (quotation omitted).  Offering nothing more than an opinion that other employees were not treated similarly is insufficient to create a genuine issue of fact for trial, and a plaintiff must substantiate her allegations with more than "speculation, conjecture, or fantasy" in order to survive summary judgment.  <u>Marquez</u>, 353 F.3d at 1038 (quoting <u>Putman v. Unity Health Sys.</u>, 348 F.3d 732, 733-34 (8th Cir. 2003)).

As an initial matter, the Court notes that plaintiff's self-serving allegations regarding the existence of discriminatory or retaliatory animus will not be considered as sufficient evidence of a prima facie case.  That is, plaintiff's general recitals of <u>her belief</u> that the treatment she received was the result of discrimination or retaliation is not the type of evidence that will prevent summary judgment in defendant's favor.  Rather, as stated above, plaintiff must present specific facts from which a reasonable fact-finder could find the discrimination or retaliation that she alleges.

With regard to plaintiff's gender and race discrimination claims for performing duties outside her job description for which she was not compensated, and her gender and race discrimination claims and retaliation claim for being held to a higher standard than other employees because she was required to perform both jobs, the Court finds that such claims were not timely raised with an EEO counselor, and will therefore grant summary judgment in defendant's favor.  As noted above, federal employees are required to contact

an EEO counselor within 45 days of an alleged discriminatory action or personnel matter. The facts above establish that, when plaintiff was hired in 2003, she was made aware that she would be performing the duties of both an Education Liaison Representative and Compliance Specialist. <u>See</u> Doc. #51, p. 4. Since she did not contact an EEO counselor until November 3, 2006, <u>see</u> <u>id.</u>, she was clearly past the 45-day deadline to allege discrimination, and her failure to allege within 45 days is fatal to her claim.[10]

Similarly, plaintiff was formally placed on the PIP 50 days prior to initiating contact with an EEO counselor to complain that such conduct was the result of discrimination or retaliation. Accordingly, plaintiff's claims regarding placement on a PIP are

---

[10]Plaintiff refers to defendant's argument as "smoke and mirrors," through which defendant tries to shift the focus from the "continuing violation" of plaintiff's civil rights. Doc. #53, p. 16. It is unclear whether plaintiff is arguing that she should not be limited by the 45-day deadline because of the continuing violation doctrine. "[U]nder the continuing violation doctrine, 'a plaintiff may challenge incidents which occurred outside the statute of limitations period if the various acts of discrimination constitute a continuing pattern of discrimination.'" <u>Tademe v. Saint Cloud State Univ.</u>, 328 F.3d 982, 987 (8th Cir. 2003) (quoting <u>Mandy v. Minn. Min. & Mfg. Co.</u>, 940 F. Supp. 1463, 1468 (D. Minn. 1996)). However, "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire" are "not actionable if time barred, even when they are related to acts alleged in timely filed charges." <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 113-14 (2002). Plaintiff cites no authority and sets forth no argument that the continuing violation doctrine should apply to her claims filed outside the 45-day window. Further, the Court agrees with defendant that plaintiff's claims regarding compensation and evaluation accrued when she was <u>hired</u> for the combo position. For example, in a refusal-to-hire case, each day that a claimant is not employed does not renew that claimant's refusal-to-hire claim; rather, it is the discrete act of not hiring the claimant that constitutes the adverse action. Similarly, in this case, it was the discrete act of hiring plaintiff to perform certain duties at a certain pay level that constituted the allegedly discriminatory act.

time barred.[11]  The Court will assume, without deciding, that the remainder of plaintiff's claims satisfy the timing and exhaustion requirements of Title VII.

With regard to plaintiff's gender and race discrimination claims based on (1) the required additional training, (2) being told by her superior to direct her questions to him, not other employees, and (3) having her supervisor tell other employees not to assist her but rather to refer her to her supervisor, the Court

---

[11]Even if this claim satisfied the timing and exhaustion requirements of Title VII, it appears that plaintiff has not established a prima facie case of discrimination.  Plaintiff does not allege or present evidence demonstrating that defendant singled out members of a protected class when it did not adopt a policy for employees to review their own evaluations.  Doc. #52, p. 3. ("The VA does not have a policy that allows an employee to calculate and determine if the statistical format is reasonable and accurate." (emphasis added)).  Regardless of whether it seems illogical or unreasonable, defendant's lack of a review policy affects its employees in a nondiscriminatory manner.  Further, placement on a performance improvement plan, without more, does not constitute an adverse employment action.  See Givens v. Cingular Wireless, 396 F.3d 998, 998 (8th Cir. 2005) (per curiam) ("[P]lacing [plaintiff] on a 'performance improvement plan,' without more, did not constitute an adverse employment action." (citation omitted)).

Further, even if plaintiff could establish a prima facie case of discrimination, defendant has offered nondiscriminatory reasons for placing her on a PIP, namely plaintiff's timeliness and quality inadequacies, and plaintiff has not shown these reasons to be pretexts for discrimination.  Plaintiff's challenges to the criteria used in her evaluation or the inability of employees to review defendant's timeliness and quality findings merely quarrel with defendant's business judgment.  Further, to the extent plaintiff alleges that a white male violated rules but was not placed on a PIP, there is no evidence that he was similarly situated to her, in that there is no evidence that his supervisor was the same as plaintiff's supervisor, that defendant treated his violations more or less seriously than plaintiff's violations, or that there were no mitigating or distinguishing circumstances.  Additionally, the Court notes that this other employee was given the choice of being fired or given a demotion, and there is no evidence plaintiff's PIP reduced her title or pay.  Finally, to the extent plaintiff challenges the manner in which her PIP was carried out compared to a PIP imposed on a white male (that is, the person sent to help her was unhelpful versus the person sent to help the white male who was helpful), the Court notes that again plaintiff fails to demonstrate that this white male was similarly situated.

finds that these conditions did not materially disadvantage plaintiff, and are therefore not adverse employment actions within the meaning of federal law.  These conditions, while perhaps minor inconveniences, did not tangibly change plaintiff's working environment.  None of these conditions resulted in a decrease in her salary, title, or benefits.  Plaintiff may have found the extra training unwelcome or a waste of time, but she does not allege that she was <u>denied</u> training necessary for her job.  She may have found seeking help from her supervisor rather than peer employees unpalatable, but she does not allege that she worked in an environment in which she was not allowed to seek help from anybody. These conditions simply are not materially significant disadvantages actionable under Title VII.  Because plaintiff fails to satisfy the third element of her prima facie case for these claims, the Court will grant summary judgment in defendant's favor.

With respect to plaintiff's race discrimination claim based on defendant's failure to promote her, the Court notes that a member of plaintiff's protected class was hired for the job. Accordingly, the Court finds that plaintiff fails to establish the final element of a prima facie case, that a person outside of the protected class was hired for the position, and therefore the Court will grant summary judgment in defendant's favor on this claim.

With respect to plaintiff's gender and race discrimination claims, and retaliation claim for the generally alleged hostile manner in which her supervisor treated her (which includes Nickens' failure to acknowledge or recognize plaintiff's

accolades, the verbally abusive, condescending, and disrespectful way he interacted with plaintiff, and the way he always treated her like she was incompetent), the Court finds that she fails to establish a causal nexus between the harassment and her protected-group status.  Plaintiff does not point to any remarks or slurs directed toward her based on her race or gender.  With respect to her prior EEO activity, Nickens' view that the EEO process was a joke[12] is at best an isolated incident, and does not, in and of itself, call into question the manner in which he treated plaintiff.  Further, plaintiff has not pointed to specific conduct that can be considered extreme or pervasive enough to create an objectively hostile or abusive work environment.  The Court will accordingly grant summary judgment in defendant's favor on plaintiff's hostile work environment claims.

Having eliminated the above claims, the Court will assume that plaintiff has made a prima facie case for her gender discrimination claim and retaliation claim that defendant failed to promote her, and turn to defendant's proffered reasons for not promoting plaintiff.  Defendant has offered a nondiscriminatory reason for not promoting her, namely plaintiff's test scores, which for the most part were substantially lower than the successful applicant's scores.  Plaintiff's challenges to the criteria used in the evaluation or her suggestion that defendant should not have

---

[12]The Court notes that Nickens never referred to the EEO process as a joke, but rather this negative view is inferred by plaintiff because some other, unidentified comments made by him raised questions with her concerning his opinion of the importance of or level of professionalism associated with anyone filing an EEO complaint.

hired an outside candidate merely quarrel with defendant's business judgment.  Further, plaintiff's own opinion that she was the most qualified candidate is not evidence of discrimination.  Plaintiff has simply failed to demonstrate that defendant's proffered reason is a pretext for unlawful discrimination.

From the record, one could conclude that plaintiff and her supervisor had a personality conflict, or that her supervisor was a difficult person to work with.  Further, one could question the wisdom in preventing peer employees from communicating with each other.  One could also determine that defendant unreasonably or arbitrarily calculated its employees' timeliness or quality of work, and that there exists no way for an employee to check or appeal certain decisions.  Finally, one might try to dispute the business sense of hiring an outside employee instead of promoting someone from within the agency.  However, it is the finding of this Court that the record wholly lacks sufficient evidence to support a finding that plaintiff's race, gender, or prior EEO activity had <u>any effect</u> on the terms and conditions of her employment.  Accordingly, as a matter of law, given the facts established by the record, no reasonable fact-finder could find for plaintiff or conclude that plaintiff should be awarded damages.  The Court will therefore grant summary judgment in defendant's favor.

For the above stated reasons,

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Doc. #39] is granted.

**IT IS FURTHER ORDERED** that the June 1, 2010, trial setting is hereby vacated.

Dated this <u>  19th  </u> day of May, 2010.

<u>/s/Donald J. Stohr                </u>
UNITED STATES DISTRICT JUDGE